# THE CONSOLIDATED COAL COMPANY OF ST. LOUIS
## v.
## AMELIA MAEHL.

*Master and Servant—Personal Injuries—Defective Engine—Contributory Negligence—Mines and Miners—Special Interrogatories—Refusal to Submit to Jury—Completion of Verdict after Separation—Evidence—Instructions.*

1. It is proper to refuse to submit to the jury questions touching facts which fully appear in evidence, and upon which no reliance is placed by the opposite party.

Consolidated Coal Co. v. Maehl.

2.   The jury may be sent out to complete their answer to special findings after they have agreed upon a general verdict and separated.

3.   In an action brought under the statute touching mines and miners, to recover damages for the death of an employe resulting from the use of a defective engine, this court holds that the evidence sustains the verdict for the plaintiff.

[Opinion filed January 21, 1889.]

In ERROR to the Circuit Court of Macoupin County; the Hon. J. A. CREIGHTON, Judge, presiding.

Mr. CHARLES W. THOMAS, for plaintiff in error.

After the jury had agreed upon a general verdict and sealed it, and delivered it to the officer having them in charge, they separated; it had been agreed they might separate after they had agreed upon a verdict.   The verdict which they were to agree upon before they separated, was not the general verdict only, but the special findings of fact which they were required by court and the law to return with their general verdict. They separated, therefore, before they had agreed upon a verdict.   It was not proper after this to get them together and have them proceed to complete their verdict.   The agreement that the jury might separate was a waiver of the right to poll the jury. . Koon v. Insurance Co., 104 U. S. 106.

And where an agreement was made that the jury, when they had agreed upon a verdict, might seal it and deliver it to an officer of the court and separate, it was held that this was equivalent to delivering the verdict into court.   Pierce v. Hasbrouck, 49 Ill. 23.

So an order to seal and deliver a verdict to the clerk, made under an agreement of parties, was held to dispense with the return of the jury and to preclude their amending the verdict afterward.   Trout v. West, 29 Ind. 51.

A verdict sealed and delivered to the officer of the court agreed upon by the parties to receive it, is delivered to the court, and if the jury separate after such a delivery, they are no longer a jury in the case.

Messrs. BURROUGHS & WARNOCK and GEORGE L. ZINK, for defendant in error.

Chapter 93 of our revised statutes, being an "Act providing
for the health and safety of persons employed in coal mines,'
was passed by the Legislature as a protection to the life of the
miner, and it should be construed with the same liberality
which led to its enactment.   Beard v. Skeldon, 113 Ill. 588.
"The statute, in our opinion, authorizes but one action, but
one recovery, for the entire loss.   If the deceased leaves a
widow surviving, she. under the statute, is entitled to sue and
recover for the loss, whatever it may be."   Ibid., page 586 of
the opinion.   "Where an action is brought to recover for an
injury resulting from the negligence of another, which was
not wanton or wilful, it is an essential element to a recovery
that the plaintiff or party injured must have exercised
ordinary care to avoid the injury; but as we understand the
authorities, when the injury has been wilfully inflicted, an
action may be maintained, although the plaintiff or party
injured may not have been free from negligence."   Litchfield
Coal Co. v. Taylor, 81 Ill. 590, at page 595 of the opinion.
The Wesley City Coal Co. v. Ann Healer, 84 Ill. 126 ; The
Bartlett Coal & Mining Co. v. Roach et al., 68 Ill. 174.

"There is evidence, and quite a good deal of it, tending to
show that defendant employed an incompetent person to take
charge of the engine used in lowering into and hoisting per-
sons out of its mine ; that defendant employed such person,
and retained him in its service, after his incompetency was
known; and that the pit-boss improperly directed a piece of
timber to be placed in the cage on which plaintiff was about
to descend into the mine.   Conceding these were controverted
questions of fact, the jury must have found them in favor of
plaintiff, and the affirmances of that finding by the Appellate
Court is conclusive upon this court, so that they are not now
open to further consideration.   Assuming these facts to
be well founded, as must be done, they fully sustain the judg-
ment rendered in favor of plaintiff.   The questions of law
made on the record are unimportant.   It is said the sixth in-
struction given for plaintiff was erroneous in stating to the
jury that the question whether plaintiff and the person
in charge of the engine were fellow-servants, ' was a question

of fact for the jury to determine from the testimony before it.' It matters little whether the charge given was correct or not in this respect. The liability plaintiff was seeking to enforce against defendant grew out of what was alleged to be a wilful violation of the act of the General Assembly provided for the 'health and safety' of miners; and the doctrine of fellow-servants had so little application to the real issue made by the pleadings, it is a matter of no moment whether the doctrine on that branch of the law was correctly stated or not." The giving of an instruction slightly inaccurate, but which, under the facts in the case, could not have worked to the prejudice of the party complaining, or have misled the jury, will not justify the reversal of judgment. The City of Chicago v. Washington Hesing, Adm'r, etc., 83 Ill. 204.

CONGER, J.  At half past five o'clock on the morning of the 13th of December, 1887, John Maehl, the husband of defendant in error, who was employed in the Anchor mine in Macoupin county, then operated by plaintiff in error, left his work in company with four of his fellow workmen and went out of the mine. Maehl and some of the others brought their tools with them, and when they got to the cage at the · bottom of the shaft, threw their tools upon the cage, got on themselves, gave the signal, and were hoisted to the landing, at the top of the shaft, when the cage stopped to let them off. The top of the shaft, where the cage stopped, was inclosed by framework with a slide gate on one side, which slid up, so that these men, by stooping a little, could go under the gate, and get off the cage onto the ground outside. When the men started up, their lamps were lit. Two or three of the lamps went out on the journey up. When they got to the top the cage stopped at the landing, and three of the men got off. Maehl called to one of the men to hold a light so that he could see to gather up his tools from the cage. The engineer heard the call for a light and mistook it for the usual signal "All right," and left his engine to look after the pump. He left his reverse lever off center, and his

relief valve closed, and while he was at the pump the engine started, the cage went up, and Maehl was thrown off the cage and down the shaft and instantly killed. His widow brought the present action under the statute in reference to mines and miners, and recovered a verdict for $5,000, upon which judgment was rendered, and the plaintiff in error brings the record here for review.

The declaration contained nine counts: the first, charging that plaintiff in error wilfully failed and neglected to provide sufficient light at the top and bottom of the shaft; the second, a like failure to have a competent person placed at the bottom and top of the shaft to attend to the signals for hoisting and lowering the cage ; the third, a failure to provide a sufficient brake on the hoisting drum ; the fourth, a failure to provide a competent engineer; the fifth, averring that there was a wilful neglect of duty to provide safe means of hoisting and lowering the cage, by permitting the throttle valve of the hoisting engine to become worn out, unsafe and insecure, so that it leaked steam to such an extent as to cause the cage to start up when it should not, etc.; the sixth, a want of lights at top and bottom ; the seventh, the failure to have a competent person at top and bottom of shaft to attend to signals and see that the employes did not carry tools, timber, etc., with them on the cage, etc.; the eighth, that the engineer was not competent, and that he had no fireman to assist him, and the ninth charges in general, defective machinery, which started the cage suddenly up and threw Maehl off and into the shaft.

Complaint is made by plaintiff in error of the action of the trial court in refusing to submit to the jury the following question, viz.:

1. "Was Maehl's death caused by the wilful neglect of defendant to place a man at the bottom of the shaft for the purpose of preventing men from carrying tools or material with them on the cage?"

2. "Did the accident by which Maehl was killed occur more than thirty minutes before the hoisting of coal commenced in the morning of that day, and more than thirty minutes after such hoisting had ceased for the night before?"

3. " Was Maehl's death caused by the wilful neglect of defendant to place a man at the top of the shaft to attend to signals ?"

4. "Was the accident by which Maehl was killed, caused by reason of the wilful failure of defendant to furnish a fireman ? "

5. "Was Maehl's death caused by the negligence of defendant's engineer ? "

The 4th and 5th of the foregoing questions were both submitted to the jury and by them answered in the negative.

The evidence disclosed that the accident happened an hour and a half before the time for hoisting coal arrived, at a time when the law did not require a man to be stationed at the shaft to attend the signals, and so far as any of the counts in the declaration were based upon a supposed failure to comply with the law in those respects, they seem to have been abandoned upon the trial, and we can not see how plaintiff in error was in any way injured by the court's refusing to submit these questions to the jury.

The evidence tended to show that the throttle valve of the hoisting engine leaked badly; that the officers of plaintiff in error had their attention called to the fact some time previous to the accident; that when the cage stopped at the landing the engineer mistook Maehl's call for a light, to be the usual signal that men gave when the men were off the cage, by calling out "All right;" that he then left his lever off center, and went away from his engine to see to his pump, and that because of this leaky valve, a sufficient quantity of steam escaped into the engine to start the cage upward within a few seconds from the time it stopped at the landing.

It does not appear clearly just how Maehl was knocked off the cage, though it seems probable, from the circumstances proven, that he was in the act of stepping off the cage, when it started up, and he was struck by the gate and thrown down the shaft.   It is insisted that because Maehl's companions had time to step off the cage and walk ten or twelve feet away before the cage started upward, that Maehl could also have escaped if he had not been engaged in picking up his tools

from the floor of the cage, and that it was unlawful for him to bring up his tools on the cage at the time, and therefore no recovery ought to be had.

The act under which this suit is brought provides, among other things, that "the owner, agent or operator of any coal mine operated by shaft, shall provide safe means of hoisting and lowering persons in a cage covered with boiler iron, so as to keep safe, so far as possible, persons descending into, and ascending out of, such shaft, etc."

The engineer in charge of the hoisting engine at the time says, "I was firing and running the engine when Maehl was killed. The throttle valve was leaking badly. I suppose it would move the cage when you did not want it to. I took them up to the ground landing. When they got off I thought I heard somebody holler 'All right.' Then I left my engine stand and went to start the pump four or five steps off, and had started the pump when Laven hollered, and said the engine had started, and I wheeled around and run to stop it, and in about a minute somebody came running and said Maehl had fallen down the shaft. The engine ran six or seven feet before I stopped it. I suppose it was the leaky throttle valve that made the engine start. The pit boss knew the condition of the brake and valve. I told the pit boss myself maybe a week before."

It is true there was a relief valve provided, which, if placed in proper position, would let the steam escape through it instead of into the engine, but it seemed not to have been opened.

The law was made for the purpose of protecting the lives of those engaged in the dangerous occupation of mining, and to keep such persons safe, "*so far as possible*," while entering and leaving the mine, and it would be monstrous to say that this law had been complied with by furnishing machinery that would stop a cage at a landing long enough for one to immediately step off, but was liable at any moment to start of its own accord, and hurl such a one to the bottom of the shaft in case he delayed his departure from any cause for a few seconds longer than was actually necessary.

We think the evidence fully warranted the jury in finding the verdict they did.

The first of plaintiff's instructions was faulty, in telling the jury that if the defendant had wilfully violated any of the said provisions of the statute as stated in the declaration, etc., the defendant would be guilty; but we are satisfied that it worked no injury to plaintiff in error, for the reason that all the other charges in the declaration, except that of defective machinery and want of sufficient light, were practically abandoned during the trial, and we think it clear that the jury were not misled by the language of the instruction.

The court in sending the jury out to complete their verdict committed no error, but was clearly acting within a proper discretion.

The judgment of the Circuit Court will be affirmed.

*Judgment affirmed.*